Next case is Lytone Enterprise v. AgroFresh Solutions, 2022-2269. Dr. Crane. Good morning, Your Honors, and may it please the Court, Casey Crane on behalf of Appellate Lytone Enterprises. This case rests on a fundamental error that affected the Board's obviousness analysis. The Board erred when it thought that because the effectiveness or release of one CP gas was not residing in the claim, that it was therefore not relevant to the obviousness analysis. But as this Court's precedent shows, that is not the case. The Board must look at the considerations those skilled artisans would have had and what would have motivated them. This case is very similar to the facts in Orchid Cat and Polaris, where the Court found that safety concerns were relevant to the motivation of the mine, even though the safety concerns were not a resided element of the claim. Counsel, there are two references here, and they're both in the same field. And it looks that there's simply a substitution of one item, methyl cyclopropane, for STSM for the same purpose. So why wasn't this obvious? So this is not the case of a mere substitution, Your Honor. We can start with ground two in the Hasano reference, which has the disclosure of the STS. STS is a powder substance that will readily dissolve in water. What AgriPress tries to do is to say it would be easy to substitute in one MCP, which is a caged gas. And for the Board's analysis in AgriPress, they treat that product as though it is just a powder solution, or a powder substance. But it's not. It's a caged gas. It requires more to release the gas from the cyclodextrin cage than just dumping it in the water like we would sugar. So it also changes the nature of the treatment of the plants. So STS is treated in the water. It takes up through the roots and the cut stems. The wind-seeking gas doesn't do that. It has to get into the atmosphere, and it treats the plants on the leaves. So it's a completely different treatment mechanism than STS. So it's not the case of a mere substitution, Your Honor. There are different motivations for ground two and ground three. I want to start with ground two, where Your Honor started with Hasano. As I mentioned, that's treating cut plants in a vase with an effervescent tablet. So you're treating it through the roots, and that's what you're doing. If you sell them that gas, now all of a sudden you're not treating it at the root. You're waiting for that gas to dissolve in the atmosphere. And then who knows whether it's going to treat the plant or not. And what Agrofresh says in their brief is that, well, a skilled artist would know to put it into a steel container, because that's what Daley says. But the board did not make that argument or that special finding. If I can direct Your Honor's attention to Appendix 33. I think this is one of the most telling errors that the court made. So what they said on Appendix 33. What page are you on? I'm sorry. What page are you on? 33, Your Honor. All right. Let me know when you're there. Okay. So in the first paragraph, it says that because no effectiveness or release level is decided, we are not persuaded that the skilled artisan would have believed creating the recited dosage form would have required a closed chamber. So right there, the board says that you don't have to have any treatment, because you don't even have to have the closed chamber. And there's no dispute that without a closed chamber, the 1-C-2 gas is not going to reach the level to treat the plant on any level of effectiveness. So that is Ground 2. I want to briefly talk about Ground 3, which is not simply the inverse as the board would have had believed. Ground 3, you start with Daley, which is the K-1-C-2 powder substance. And Daley doesn't tell you that there's any problems with the handling. It says it's actually a more convenient way to treat with 1-C-2 gas. But what Agrofresh says is, oh, let's put it into a tablet, because that makes it easier to distribute. But they never tell us how you get the gas back out. We know from Daley and from other references in the record that K-1-C-2 gas is not a simple gas to get out. So why would you put it into something that would make it even harder to get back out? And Agrofresh and the board never answer that, because they always revert to, oh, well, you don't need a certain amount of release or treatment. But as a skilled artisan, the only thing they would have cared about was treating the plants. But why isn't it the case that it was understood that the gas would be released from the cage upon being entered into a solution, and the powder is entered into a solution? So it seemed to be pretty well accepted. So it was not well accepted, Your Honor. So first, this product had been on the market for about a year. And the nature of the cyclodextrin cage that holds the gas creates solubility issues, because it's not soluble in water. And so what happens is you end up with the issue of release kinetics, where once you start having a little bit of gas come out, you have empty cyclodextrin, and it creates this equilibrium. But the equilibrium involves some release of the one MCP, right? Right. So the fact that you don't get a complete release of the MCP is just a matter of degree, right? It's a matter of degree, but it's a matter of important degree, Your Honor, because you still have to have enough release such that a skilled artisan would be motivated to modify the reference. If you were going to get at least the same amount of release, why would a skilled artisan modify the reference at all? That's really the nature of the issue that the board really failed to grapple with. They just ended the discussion that we don't really need any level of effectiveness or release because it's not in the claims. But fundamentally, this was what was important to a skilled artisan. That's the real-world facts that Arctic Cats, as the board and the court, should look at. And so I would say there's no confident evidence in this record to demonstrate what amount of release was sufficient to motivate a skilled artisan to modify the reference. And there also is no evidence or factual finding about what amount of release would have been known to be achievable if you modified either the SOTA or daily, depending on which ground you're starting with. And it doesn't exist in the record, and here's why. The petition said virtually nothing about getting the 1MCP gas back out. It was all focused on showing that 1MCP gas could be tabulated without releasing the gas. So that's all their expert said. In our response, we brought in our expert who talked about the difficulties of releasing the 1MCP gas from a tablet. Then, because their expert had not really got a plan on release, she submitted a supplemental declaration that was very conclusory to address release. Importantly, the board never relied upon or cited to that part of the expert's declaration. The only evidence that the board relied on was what was in the ground references themselves. And ultimately, even if the board had considered Dr. Wallace's supplemental declaration, again, it was conclusory, it cited nothing, and it was provided by really important documentary evidence. And that evidence is in the form of the Roman Haas patent, which is Agrofresh's predecessor in interest. And the board basically refused to consider any of the disclosures in the 153 patent as part of its analysis. It has one sentence where it said, you know, we cited no precedent to say that we have to hold Agrofresh accountable for an application of a predecessor. But that's not what we were asking the board to do. The 153 patent has specific disclosures that talk about the difficulty of releasing the one-inch-feet gas from that cage, and specifically on how it got harder when you have larger quantities. And the 153 patent talked about if you use an effervescent tablet, it was surprising that it would work because an effervescent tablet, think like Alka-Seltzer. You drop it in water, it bubbles for a few minutes, and then it stops. But yet, that was enough for the release of the gas to continue on for hours. And that was surprising. And so that is contemporaneous, independent evidence from Agrofresh's predecessor that the board flatly refused to consider. And that alone is legal error that would constitute at least being caged under remand, if not reversal. So... This error also affected the obvious-to-try analysis as well. So as we laid out in our brief, the board's analysis here really amounted to obvious-to-try. They used some variations on that language to basically say, based on these references, you would try it. But what the board didn't do is they didn't get to the final part of the KSR test. They said, okay, there's a problem that needs to be solved, there's a finite number of solutions, but they never addressed whether those solutions were predictable. And because this was a new product, because there was nothing in Hisano about releasing a gas... They have to be predictable? Sorry? Do they have to be predictable? So absolute predictability is not required, but a reasonable expectation of predictability is. And here, there was nothing in either Hisano or Daly that would suggest that it was predictable that you would get sufficient release that would have motivated a skilled artisan to make the modification. Wasn't there, in this case, a finite number of predictable results? So out of the cabinet, it was a finite number of solutions, but there was no finding of predictability, and that's where the board's analysis fell down. So, yes, there was a finite number, but it was not predictable, and that's not enough. Under KSR, you have to be able to show it's predictable. Otherwise, you're back in the traditional motivation-to-buy-reasonable-expectations-of-success situation. And again, there's nothing in the record that suggests that you can get the one-institute gas back out of the tablet after tabulating it, or that you could use that in Hisano and effectively treat plants, because one, you don't know if it's coming out, and two, you don't know if it's really getting onto the plant to block the ethylene receptors. So, coming up to your rebuttal time, you can continue or save it as you wish. Unless, Your Honor, I have any additional questions, I'll save the rest of my time for rebuttal. All right. Mr. Nimrod. Thank you, Your Honor. Thank you, Your Honor. Ray Nimrod on behalf of AgriFresh. I'd like to start with ground three, if I could. Turning to ground three, it starts with the Daly reference, which discloses that one MCP gas is a superior ethylene receptor blocker than what was the current standard, STS. STS, however, was known to have a severe waste disposal problem, as Daly taught explicitly. That's at appendix page 816. But as a gas, it was difficult to deliver. Daly invented MCP gas caged in a cyclodextrin powder so that MCP could be treated and handled as a powder. Daly also taught that one could use the powder to treat multiple plants at one time in a sealed container or entire room. That's at appendix page 821. Daly also taught that mixing with water results in dissolution of the powder and therefore the release of the gas, for example, at appendix page 824. So the analysis here with Daly is very straightforward. Daly taught success on a larger scale than a single plant, put it in a container, seal it up, put it in a room, and that the key to dissolution was to... the key to release was to simply dissolve the powder in water. And the board... Your opposing counsel is suggesting that that was not really understood to be an effective way to release the gas. Why don't you address that issue? Yes. Your Honor, at appendix page 15, Daly discloses... So Daly was already out in the market called Ethelblock. It was there, and people were taking the powder and they were putting it in there and it was releasing into these containers, rooms, and it was effective to release there. So the issue is not whether once the powder hits the water it's going to release. It did, and the board didn't ignore it. It said, for example, at appendix page 15, to solve this issue, the board says, quoting Daly, quote, a method of incorporating these gaseous compounds which inhibit the ethylene response in plants in a molecular encapsulation agent complex in order to stabilize their reactivity and thereby provide a convenient and safe means of storing, transporting, and applying or delivering the active compounds to plants. The application or delivery methods of these active compounds can be accomplished by simply adding water to the molecular encapsulation agent complex. What page again are you on? That's at appendix pages 15 to 16, quoting Daly, Your Honor. All right. And then there's other examples throughout. The board made multiple findings on this. Well, I think everybody agrees that there's some release of the gas upon being put in a solution, even a solution of water. The question is, is it enough to matter? And the argument your opposing counsel is making is that this, because you rapidly reach an equilibrium state, that there isn't enough gas coming out that has the potential to be effective in the manner that the invention requires. Your Honor, so the issue here is we're starting with Daly. So Daly would have the same problem. Daly is a powder that's being sold in the market. Daly teaches that if you put this powder in a bucket of water, it's going to go out and treat the plants, the fruits, apples, etc., in the container. So that's already a done deal, so to speak. Daly's teaching that. Ethelblock teaches that you can use this in rooms that go from anywhere to what would be a 4x4x5 container up to hundreds and hundreds of thousands of square feet of application. And that's the powder. So if the powder can be dissolved in a bucket and go out and treat things as a powder, as Daly taught, then the only question is whether or not if you then take it and you put it into an effervescent tablet, will that be better? And so we go back to Ground 3 as we were talking about. Hazano is the second half of it, of course. Hazano, which is Appendix Page 810, taught that using a tablet with effervescent agents improved dissolution as compared to powders. So again, the starting point is Daly says this works with powders. It's fine. Ethelblock says the same thing. Put it in a room. It's going to work. And Hazano says, well, one of the problems with powders is they don't get complete dissolution. And so what I've invented now is not just to put it in a tablet. So it's not just any old tablet. You might put, like, a medicine tablet into a thing of water. This is an effervescent tablet that's meant to make dissolution better than a powder. So Daly teaches that if you use an effervescent agent, Appendix Page 810, you get improved dissolution compared to powders and that you get superior handling characteristics as compared to powders. It's easier to take a tablet than to measure out a scoop. You know exactly how many to put in. And the board found a clear motivation and a reasonable expectation of success in starting with Daly's powder and putting it into an effervescent tablet form as taught by Hazano. The board found that Opposa would have, quote, chosen. I'm sorry, this is in Appendix Pages 39 to 40. The board says Opposa would have, quote, in an effervescent tablet as taught by Hazano for the improved dissolution benefits realized by use of effervescent ingredients. So you have Daly that says this works as a powder, and yet Hazano is saying, well, if you want to make it better, then use an effervescent tablet because as the thing is dissolving, of course, it's generating gas right there, dissolves the thing, you get better dissolution. So the board found that you would expect to get improved dissolution from Hazano, not just as good as the powder. Now, Lightone in its brief says its expert testified that a skilled artisan would not have wanted to look to put Daly's powder into a tablet because they would have expected that to inhibit release. The board considered that and rejected that argument and made the contrary finding that I just read, that they would expect improved dissolution. That was the point of Hazano. There's substantial evidence. Improved with the effervescence. With the effervescent tablet, Your Honor, yes. And is the idea behind the effervescence that it turns the solution and exposes the water more readily to the cages? That's correct, Your Honor. So it's breaking everything up in a better way than just throwing the powder would be and getting that thing dissolved. So you're going to improve dissolution. The board actually quoted the specific portion of Hazano. This is at appendix page 27 where Hazano teaches that when you use an effervescent tablet, well, the board says, Quote, Hazano is teaching that an effervescent tablet, which when dissolved in water creates, and then they quote Hazano, Quote, generated carbonic acid gas that will promote assimilation action, which will be effective for cultivating and preserving the freshness of the cut flowers of plants. So Hazano is teaching you get promoting a better assimilation by using the effervescent, and the board adopts that as part of its finding. So it's better than a powder. So they had a perfectly valid ground to reject Litone's expert, but the real important point here, of course, is that the issue is substantial evidence, and there's substantial evidence to support the board's findings here, regardless of what their expert said, and that the board addressed all of it. And just if I can, just for a moment, address an issue that came up in their briefing. The board did not impose a burden of dissuasion on Litone as the patent owner. They put the burden squarely on AgriFresh. At appendix pages 2 to 3, the board states, In this final written decision, after reviewing all the relevant evidence and assertions, we determined the petitioner has met its burden of showing by a preponderance of the evidence that claims 3 and 11 of the 185 patent are unpatentable. And then for each of the two different sections that are at issue here, which is motivation and reasonable expectation of success, at pages 19 to 21, this is for ground 2, the board says, quote, 19 to 20, they look at the evidence and they say, quote, After reviewing the record and the arguments of the parties, we find the weight of the evidence supports petitioner's allegation that one of skill in the art at the time of the invention would have been motivated to combine the teachings of Hazano and Daly to make the subject matter of claims 3 and 11. So they found that we provided sufficient evidence to show that it was a motivation to combine. And then on the next paragraph, they go on and say, quote, The patent owner argues that petitioner fails to meet its burden to show that skilled artisan would have been motivated to combine the teachings of Hazano and Daly to make the claims subject matter. So they've already found that we met our burden. They found there was motivation. And they said now we're going to look at their arguments and they say that petitioner said that we didn't meet our burden and the board says we are not persuaded. They go through all the evidence and explain why they weren't persuaded. And then turning to expectation of success, the board analyzes the evidence from pages 29 to 31 and then says, quote, this is on expectation of success, Having reviewed the record, after having reviewed the record and the arguments of the parties, we find the weight of the evidence supports the petitioner's conclusion that one of skill in the art at the time of the invention would have reasonably expected success in making the claims subject matter for the reasons set forth above. So they made that finding. Then they go on and say, We address patent owner's arguments against a reasonable expectation of success below. And they go through and explain why that doesn't change their view is the fact there was a reasonable expectation of success. So the burden was squarely on, I aggriface as it should be, and the board found the evidence supported both motivation and reasonable expectation of success. Now, Latone argues that in effect what the board, in effect and in text to some extent, the board really involved in an obvious to try analysis. Do you want to address that question? I would, Your Honor. Can I just first say that the obvious to try language is only found that they cite with respect to ground two. With respect to, yes. Right. There's nothing in ground three that says that at all. So I'd like to get that up front. Let's focus on what exactly the board said about ground two with respect to obviousness to try. Okay. So, Your Honor, just I will answer that one here. There's two things I would say to that. One is they did not apply obvious to try. Then two, even if they did, it would be perfectly fine under this Court's law. On the first point, Your Honor, they didn't use the words obvious to try. They didn't cite the law that won't cite on obvious to try. Instead, the board said at appendix page nine that the standard is, quote, the obviousness inquiry typically requires an analysis of whether there was an apparent reason to combine the known elements in the fashion claimed by the patented issue. The board did use the word try, not obvious to try, in I think three instances, and it was always in the context of the reasons for the motivation to combine because there's straightforward motivations here. For example, at appendix page 26, the board says, quote, Daley's teaching of using a cyclodextrin cage stabilized and powdered version of one MCP to inhibit ethylene binding in plants would have motivated the skilled artisan to try this stabilized version in Hazano's effervescent tablet preparation because of the benefits of effervescent ingredients for dissolution and dispersion to treat plants on a larger scale. They are simply giving the reason for a motivation there. In fact, the next paragraph they go on, and they have a paragraph where they go through at appendix page 26 to 27 three reasons why there was a motivation to combine. It's actually numbered one, two, three. One is Daley's teaching that SDS is problematic for and has problems with waste. Two is Daley's teachings that cyclopropene and its derivatives are commercially acceptable replacements for SDS and that powder complexes provide advantages over compressed gases for safety control. And three, Hazano teaches that the tablet will, again, they quote, generate carbonic acid that will promote assimilation. So this is a straightforward motivation to combine finding here. They use the word to try, but it was in the context of identifying the reasons why there was a motivation to do that. But, again, even if there was, though, they had applied obvious to try, I don't think that would be a problem at all because they made the findings that there was a limited number of compounds that could be used. In fact, the big three ones were MCP was just on the market, the new powdered one, SDS, and then you have AEO. That's it. And Daley talks about the other two and says why they're problematic, but there's a finite number of options out here. The board made a finding that the two were known to be substitutable for each other, and the board also found that you would have an expectation of release. Addressing, for example, the reply declaration that our expert put in, I think counsel made the comment that our expert's declaration on reply, she stated, did get into the reasons why a poser would expect release, which is pretty straightforward. Daley already teaches that if you throw the powder into a bucket, it's going to release. Now you've got Hazano, and it says you're going to get more. But the board did not ignore our expert's declaration. At appendix page 26, the board said, quote, Daley's teaching of using a cyclodextrin cage stabilized and powdered version of 1-MCP to inhibit ethylene binding in plants would have motivated the skilled artisan to try the stabilized version in Hazano's effervescent tablet preparation because of the benefits of effervescent ingredients for dissolution and dispersion to treat plants on a larger scale. And they cite the opening declaration, but then also cite appendix exhibit 1035, paragraphs 11 to 18, which is exactly where our expert's reply declaration, those are the paragraphs where she explains, and the board cites her paragraphs, that the gas is going to release, and if one molecule touches, it's going to have an effectiveness. And the board goes on and says, well, and she goes on, excuse me, and says, but of course if you want more effectiveness, you just tent it, which is exactly what Ethelblock taught. I mean, Daley taught that if you want better effectiveness, you tent it. Ethelblock taught you tent it. So they didn't ignore her declaration. They cited it and relied on it. Your Honor, we submit the decision that PTAP should be affirmed on both grounds two and three. If Your Honor has no further questions. Thank you, counsel. Thank you, Your Honor. Dr. Cranning has a little time. Thank you, Your Honor. So I'd like to start where my friend started. That is with the ground three analysis. I think that the analysis was dramatically overstated. If you go to the board's opinion, and you look at how much page space they've kept for ground three, it's a paragraph. And so I think that my friend spent more time on ground three than the board did on this analysis. So I want that to be clear, Your Honors. And nothing that I think you just said grapples with the Roman Hoff evidence. And I think it would be helpful to actually look at this. It's at Appendix 1698. So, guys, I think a fundamental issue here is what Daley taught and what a skilled artisan would have understood from that. And I think it's important to know what skilled artisans who are working with that product faced. And so on Appendix 1698, what you see at line 51, it says, However, 1MCP release for a larger quantity of the powder can be very slow and incomplete, sometimes taking days. This is especially true for the large quantity of powdered complex needed to treat full-scale fruit storage rooms. Stirring the powder water mixture does not appreciably speed up 1MCP release for a large quantity of the complex or evolve. This is the problem that was still being faced after Daley's disclosures. And that has not been addressed at all by the board or by AgriBrush. That's the true use in practice. Now, the other point I want to make is that Hisano does not say anything about how effervescence would affect the release of a gas from a cyclodextric cage. It's purely about how effervescence would affect the release of a solid or liquid active agent. And, in fact, if you look at Daley's disclosure, where there is one, a couple passing references to bubbling, it doesn't say that bubbling improves the release at all. Isn't that a very simple proposition, that effervescence tends to mix the solution and, therefore, produce a higher rate of solubility in any solution? But to your point, to that point, Your Honor, mixing wasn't enough. What I just read in the AgriBrush, the Roman Haas patent, says stirring it is not speeding up the release because this is a complex system. It's not just a matter of stirring it up to have more turnover. You're still facing the release cage of the empty cyclodextrin and the full cyclodextrin. So, respectfully, Your Honor, it's not a natural result of the effervescence. And even in Daley's disclosure, where a reference… Well, you don't think that's true generally? Just as a matter of ordinary basic chemistry, that if you mix things, you tend to get solutions, things just get solubilized more quickly? It depends on the level of solubility of the material that you're working with. So, the solubility of the cyclodextrin is highly insoluble in water, Your Honor. That's why I say that. And our expert talks about this at appendix 2108 to 2109, about how the kinetics here are different than any other sort of classic solid or liquid ingredient, where Your Honor is absolutely correct, where the mixing would improve solubility. It doesn't work with this kind of product, because this is a unique caged gas that Hisano did not contemplate at all. And one last point I wanted to make, Your Honor, is that we're not… We believe that the board legally erred in its obvious analysis because it did not have the predicate requirement to show that a skilled artisan would have been motivated to modify either Hisano or Daley because there was no showing that they would have enough release to make the modification in the first place. I'm happy to answer any other questions, but I think my time is out. Thank you, counsel. Both counsel, the case is submitted.